## COUNTY TREASURERS' TEST CASE.

### WIRT ADAMS, STATE REVENUE AGENT, v. RICHARD H. WATT ET AL.

COUNTY TREASURERS. *Commissions. Code* 1892, § 2016. *School funds.*

Under code 1892, § 2016, providing compensation for county treasurers, they are entitled to commissions on the school fund as on other county funds received by them.

FROM the chancery court of Warren county.

HON. WILLIAM C. MARTIN, Chancellor.

Adams, state revenue agent, the appellant, was complainant in the court below; the appellees, Watt and others, were defendants there. The suit was a proceeding on the official bond of George P. La Barre, deceased, late treasurer of Warren county, for an alleged failure to discharge the duties of his office and consequent breach of condition in this, that of the school moneys received by him in the years 1896 and 1897 he failed to pay over and illegally appropriated certain specified sums, on the claim that he was entitled to the same as commissions on the county school fund received by him as such treasurer during the years mentioned. It was a test case involving a large sum of money and affected a great number of persons.

The answer of defendants, who were the administrator and sureties of La Barre, denied all wrong doing, but admitted as matter of fact the retention and appropriation of the sums mentioned, and averred that the same were duly and legally allowed to La Barre by the judgments of the board of supervisors of the county as his commissions or fees as county treasurer at $2\frac{1}{2}$ per centum of the school fund received by him as such treasurer for the use of the county; that said La Barre, for neither of the years mentioned, received commissions or fees as county treasurer exceeding in the aggregate $1,000, nor did

the amount received by him as commissions or fees for his serv-
ices as county treasurer in either of said years exceed 2½ per
centum on twenty thousand dollars, nor was any part of the said
sums sued for received by him from his predecessor in office,
nor were the sums retained by him as commissions in excess of 2½
per centum of moneys which he did not receive from his prede-
cessor in office, nor in arriving at the estimate of his commissions
which embrace the sums sued for was the percentage calculated
on any sum received by him from his predecessor in office;
that the allowances in question were lawful and proper and
made in conformity with the usage and custom that had pre-
vailed in Warren county and the other counties of the state for
many years, and were made under authority of § 2016 of the
code of 1892, which appears in the chapter on fees in the words
following:

"The county treasurer shall be allowed two and one-half per
centum on all money received by him for county purposes except
what he may receive from his predecessor in office, but when the
amount on which he is entitled to commissions shall exceed
twenty thousand dollars in any year he shall be entitled to only one
per centum on any such excess; but a county treasurer shall not
receive more than one thousand dollars for his compensation."

The defendants in their answer further averred that the
words "county purposes" are neither of them technical words
and that during the whole time said provision has been in force,
extending, at least, to the year 1869, they had been taken as
used in their common and ordinary acceptation and meaning by
all the officers of the state and the boards of supervisors and
other officers, and some of the lower courts, and construed as
authorizing the county treasurers to be allowed and paid com-
missions on the school fund as funds coming to their hands for
county purposes. The defendants exhibited with their answer
a list of the county treasurers to whom allowances of commis-
sions out of the school fund had been made by the boards of super-
visors of their respective counties, and it embraces all the coun

ties of the state, and defendants further exhibited a blank form of report adopted by the state board of education, which called for a statement by the county treasurers, under § 4045, code of 1892, of the amount of their commissions on the school fund, among other items of information, and also the official opinion of the present attorney-general and his predecessor in office, and, further, an opinion of the complainant himself, all delivered since the adoption of the present code, to the effect that under § 2016 thereof the county treasurers were entitled to commissions out of the school fund.    They further alleged in their answer that the commissions fixed by said code section exclusive of fees on the school fund did not, at the time of the adoption of the code, nor at any time before or since then, equal one thousand dollars in any county of the state; and that the compensation of the county treasurer, under said section, should the commissions on the school fund not be included as a part thereof, would be unjust, disproportionate and inadequate to the responsibility imposed upon them and contrary to public policy.

The case was set down for hearing on bill and answer on the day the answer was filed by the complainant, thus admitting the truth of all matters well pleaded in the answer, and from a decree dismissing his bill an appeal was prosecuted by the state revenue agent.

*Mayes & Harris*, for appellant.

It is settled law that an officer is not entitled to fees or other charges or allowances, by way of compensation, unless the law expressly so provides.    *Hendricks* v. *Supervisors*, 49 Miss., 612; *Beck* v. *Allen*, 58 Miss., 143, 158; *Bordeaux* v. *Warren Co.*, 66 Miss., 231; *Marshall Co.* v. *Tidmore*, 74 Miss., 317; Code 1892, § 1987.

The treasurer was not entitled to retain commissions out of the school moneys, for the simple reason that the statutes did not allow him to do so.    The statute in question (there is no other) is § 2016, code 1892.    Let it be carefully noted that the

language of the grant (for it is, in effect, a grant to the treasurers of public moneys) is not simply "a per centum of all money received by him," but other words are added, and those are essentially words of restriction and definition. The commission is allowed only on and out of those moneys which are received "for county purposes." What are county purposes? What does such a phrase import to one who is properly acquainted with the governmental science of American states? We shall ask the court, in this connection, to consider the nature of a county.

In Hannis Taylor's great work, which made him great reputation, on "The Origin and Growth of the English Constitution," will be found a lucid and exceedingly interesting history of the development and formation of the county. Beginning prior to the Norman conquest, he shows how it was that the ancient hundred was an aggregation of townships, and the shire an aggregation of hundreds; how that, surviving the shock of the conquest, the English shire, under the Norman name of "county," maintained unimpaired its old position as the governing unit in the local administration. The court will find, also, an instructive article on the functions and nature of a county in the Encyclopedia Britannica, title "County."

From the authorities it seems indisputable that the shire or county was never in any way in touch with the matter of public education. Indeed, until so late as the year 1870, in no sense was popular education a governmental function in England, or in any way undertaken by the government. There was no warrant whatever for considering it as a "county purpose." Counties, being component parts of the state, can exercise only such powers as are granted expressly, or by necessary implication. 7 Eng. & Am. Enc. L. (new ed.), p. 926; *Nashville R. R. Co.* v. *Wilson Co.*, 89 Tenn., 597; *Hawkins* v. *Carroll Co.*, 50 Miss., 735, 762; *Wheeler* v. *Wayne Co.*, 132 Ill., 599; *Brabham* v. *Supervisors*, 54 Miss., 363. In 7 Eng. & Am. Enc. L., p. 937, where the "governmental functions"

of the counties, with which they are usually invested, in order to facilitate ·the due administration of their own internal affairs and to promote the general welfare of the municipality, are considered, public education is not mentioned.

Up to the time of the late civil war, in this state, the county, in its quasi corporate capacity, had never been brought in touch with the matter of education.    When the constitution of 1869 was adopted, it declared an entirely new departure on the school question.    Article 8, on the subject of " School Fund, Education and Science," was introduced.    Section 5 of that article established " school districts."  The constitution then provided for a school fund, and, in section 10, authorized the levy of taxes in aid of it, and that section concludes with the explicit declaration that "all school funds shall be divided *pro rata* among the children of school· ages."    The constitution thus carefully placed the organization and maintenance of the schools on the district, not the county.    There is a clear and significant discrimination.    It was the district, not the county, which was to forfeit the right to a share of the funds by failing to maintain the school.    Therefore, in case a county should contain more districts than one, there might be a failure and forfeiture in one district and not in the other, so that one part of the county would get a share, while another part got none.

The distinction thus made in the constitution between a county and a school district was carefully observed in the act of 1870, which organized the system and put it in operation. Laws 1870, p. 1.    Sections 1, 2, 3, 9 and others of the act clearly show the difference.    It is true that section 2 provides that every county shall constitute one school district, but the mere fact that the boundaries of the district are, for purposes of convenience, made coincident with those of the county could not set aside the clear constitutional discrimination between the two distinct municipalities, nor does the act itself indicate any such legislative intent.    On the contrary, the act itself recognizes and enforces the distinction with equal clear-

ness and emphasis.    *Horton* v. *School Commissioners*, 43 Ala., 598, 607.

This noteworthy and important feature of the school law, which so indisputably marks the difference between a district and a county, has been preserved in all of the subsequent statutes.    Not only preserved, but made even more marked.    The code of 1871, § 1994, reduced the number necessary to a separate town district to three thousand.    The act of 1873, sec. 2, p. 1, reduced the same to two thousand.    The act of 1878, sec. 34, p. 103, reduced the same to one thousand.    In the code of 1892, § 4012, we find the same reduced to three hundred. Thus we see that the difference between the school district and the county has been growing greater and greater continuously. And how great that difference is shown by the following sections of the code of 1892: 4012, 4013, 4014, 3995, 3998 and others.    Especially note two provisions of § 3995: (1) The provision that "separate districts shall be made for the schools of the white and colored races, and the districts for each race shall embrace the whole territory of the county outside of separate school districts," wherefore, if the county is the district, we have express provision that each county shall be two separate counties, etc., one a white county and the other a black one.    (2) Note the express provision for embracing adjacent parts of two counties in one district, etc.    Nothing can be clearer or more certain than the difference between the school district, even where defined territorially by county limits, and the county itself.    The whole school system is based on the district, notwithstanding the fact that, in many instances, the law laid hold of a part of the county machinery for the practical administration of the school business.    The district is the unit and no school moneys are handled by the respective agents, nor for "county purposes," but for school district purposes.    Nor is this a fact peculiar to Mississippi; it is common to the school systems everywhere.    21 Am. & Eng. Enc. L., 779, 780. The more we study the legislative and judicial history of this

matter in this state the clearer does this fact become.  *Jarvis* v. *Supervisors*, 49 Miss., 603; *Supervisors* v. *Klein*, 51 Miss., 807, 811; *Beck* v. *Allen*, 58 Miss., 143, 160.

The constitution of 1890 itself, sections 205, 206, recognizes the fact that the county and the school district are two distinct municipal organisms.   It speaks of the "school district" in the county.   It would be absurd to talk about the county in itself.   The fact is, and it is unavoidable, that the law intends and provides that a county may contain more districts than one.   There is a district whenever and wherever there is a town of three hundred inhabitants, if those people desire to be a district.   There may be several of such districts in any county.   Then, the residue of the territory of the county may constitute another district.   A district, where the population is sparse, may coincide with the county, but it is not the county.   Such a thing as a district coincident with a county, yet different from the county organism, is by no means unknown otherwise in our constitution.   It exists in the judicial department and is the basis of the organization of the state senate, in which many districts are composed of single counties.   *Lindsley* v. *Coahoma County*, 69 Miss., 815; Constitution 1890, art. 13.

In *State* v. *May*, 54 Miss., 417, 420, this court decided that the school funds and the "county funds" *eo nomine* (that is the exact expression of the court) are things so distinct and separate, and the laws relating to them are so distinct, that the county treasurer could not be held on his county bond for school moneys.

In *State* v. *Felton*, 59 Miss., 402, the foregoing case was followed, and the duties of the county treasurer in respect to the two classes of moneys were expressly denominated "two distinct duties."   *Hall* v. *State*, 69 Miss., 529.

Resuming, now, the examination of the legislative history of this subject, and this time with an eye particularly to the county treasurer's connection with the school funds and his

commissions, we see the act of 1870, by section 25, made the county treasurer the custodian of all the school funds of the county, exacted the additional bond from him as such custodian, and allowed him "two per centum for all school moneys disbursed by him;" and sec. 40 required him to keep an elaborate system of accounts with the various school funds. Code of 1871, § 2024, allowed him the same fees on school moneys. It will be noted, at the same time, that this code made no allowance to the county treasurer whatever for any commissions out of the general county funds. That matter seems to have been omitted, and to have been treated as controlled by the code of 1857. Now, by this code of 1857, p. 133, § 166, it was provided that "the county treasurer shall be allowed three per centum on all money received and paid out by him for county purposes, as a compensation for his services in said office." Thus, after the passage of the act of 1870, he was, by express provisions of the law, entitled to receive three per centum on moneys received and paid out "for county purposes," and two per centum on moneys disbursed for the school purposes.

The act of 1875, pp. 146, 159, is instructive. Observe the careful discrimination between the school taxes and the ordinary county taxes in fixing the commissions of the collectors and the assessors. They were allowed commissions on school taxes, but the statute clearly shows that it was considered necessary to name school taxes specially in order that the allowance be made. And see the act of July 31, 1875, p. 17 (special session) fixing the compensation of county treasurers. Note the careful discrimination between the "general county tax, out of which all current expenses of the counties shall be paid," on the one hand, and the school tax on the other, indicated by sections 1 and 7 of the act of February 1, 1877 (Laws, p. 14).

In the year 1878 there was rather an extensive revision of these matters, touching the general finances and the school matters. Section 100 of the act of March 5 (Laws, p. 79),

provided that "the county treasurer shall hereafter receive as full compensation two and one-half per cent. on all funds which may come into their hands by virtue of their office," etc. Note the expression used, "on all funds which may come into their hands by virtue of their office." Now, it cannot well be questioned that the school moneys came into the hands of the county treasurers "by virtue of their office;" not for county purposes, it is true; but still, by virtue of their office, albeit for school district purposes, and they were, under the statutes, entitled to commissions on such moneys.

Then came the code of 1880, of which § 450 made provision for the fees of the county treasurers. In order to see clearly the changes of that section, let us compare it with the pre-existing law (sec. 100 of the act of 1878) by the use of parallel columns:

Section 100, Act of 1878:

"That the county treasurers hereafter receive as full compensation two and one-half per centum on all funds which may come into their hands by virtue of their office (except what may have been received from their predecessors in office), not exceeding $20,000 in any one year, and, on all in excess of $20,000, they shall receive one per centum only."

Section 460, code of 1880:

"The county treasurer shall be allowed two and one-half per centum on all moneys received by him for county purposes, except what he may receive from his predecessor in office; but when the amount on which he is entitled a commission shall exceed $20,000 in any year, he shall be entitled to only one per centum on any such excess," etc.

It is perfectly manifest that § 460, code 1880, was drawn from sec. 100 of the act of 1878. The percentage of commission is the same, the sums limited as the basis of that percentage are the same, the percentage on the excess is the same, the structure of the two sections is the same. What change is made is therefore made for a clear purpose. That change is very manifest, and it is conclusive of this argument. It is a change of the funds on which the percentage is to be calculated, and from which they are to be taken. The act of 1878 gave com-

missions on all funds which should come into the treasurer's hands by virtue of his office; this act changed the law, and allowed commissions on only such funds as were received by him for county purposes. This change was certainly not accidental nor casual. It was for a purpose.

We now come to the code of 1892, § 2016, which is the statute that immediately governs this case. The court will see that it is § 460, code 1880, exactly, brought forward and re-enacted without the slightest change. This is the reason why we have been so careful and full in the discussion of § 460 in the code of 1880. It is the same statute, simply brought forward, and, in the code of 1892, it means just what it meant in that of 1880.

Public education is not a county purpose. It is a state purpose, and a fund in the hands of fiduciaries for that end, it makes no difference whether these fiduciaries be state depositaries or county depositaries or city depositaries, all are held for state purposes—a state purpose which is clearly defined and indubitable. The whole system finds it origin in the constitution of 1869, in and by which it was declared (art. 8, sec. 1) that "It shall be the duty of the legislature to encourage by all suitable means the promotion of intellectual, scientific, moral and agricultural improvement by establishing a uniform system of free public schools by taxation or otherwise," etc. The same paragraph is brought forward into the constitution of 1890, and there becomes section 201, omitting the preamble. Therefore, the constitutional convention, representing the people of the state, laid their mandatory injunction upon the legislature, as a duty, that these schools should be established, and the establishment of them was to be provided for by the legislature, acting in its capacity of law-making body for the state,. and not to be provided for by the local subdivisions or local functionaries. The counties have nothing to do with it. They have no option. The law does not make it their duty to provide for these schools. The school system in any county is not

due to the initiative of that county.    It cannot be suspended by the board of supervisors or by the voters of the county.    The provision of the constitution, that the system shall be '' uniform,'' is significant in this particular.

Whence are derived the moneys which go to the making up of the school fund in this state?  The interest on the Chickasaw school fund in the Chickasaw counties;  the proceeds in the Choctaw counties, whether by way of interest, or by way of rents, of the sixteenth sections;  the receipts from the two and three per cent. funds, all come from the United States government.

The poll taxes and common school fund, which comes from the general fund in the state treasury, and constitutes by far the greater portion of the entire school funds, come from the state.

In the county school districts the foregoing sources of income are supplemented by county school district taxation (wrongly called county taxation), and in the so-called separate school districts (which are no more separate than the others, as a fact, and are so designated only for purposes of convenience) they are supplemented by local district taxation, which is commonly called a town tax.

It is not only true that the genesis of the school system arose, as above stated, from the constitutional mandate; it is not only true that the funds are mainly derivable from the United States government and from the State of Mississippi, but it is also true that when those funds find their way into the hands of the county treasurer, they are not disbursed or appropriated by the boards of supervisors as county funds proper are—that is to say, as are funds held for county purposes. . The law declares that funds held for county purposes, whether general or special, shall be disbursed by the county treasurer only on warrants ordered to be issued by the clerk after allowance by the board of supervisors.  The board of supervisors is the exclusive authority to allow and disburse the same.    Whereas, the funds held by the county treasurer for school purposes are disbursed principally upon the order of the county superintendent, sub-

ject to the approval of the board of supervisors; and in the case of the payment of teachers' salaries (which this court will know judicially consumes almost the entire fund), the board of supervisors have no connection with the matter at all, but the clerk of the board issues warrants on the certificate of the county superintendent, without any intervention of the board in any capacity.

*Miller, Smith & Hirsh,* for appellees.

If this were an ordinary action between individuals, the complainant would be denied relief by operation of the principles of estoppel.

On May 4, 1897, Prentiss Buie, Esq., county treasurer of Lincoln county, addressed the revenue agent an official communication, specifically demanding information concerning his right to commissions on the school funds. He says: "Now, what I wish to know is the amount of my commissions, as county treasurer, on above funds and amounts. Do the words 'county purposes,' in § 2016, code 1892, embrace school and teachers' institute funds, or is it confined to the county fund proper?"

On May 15, 1897, the revenue agent officially responded in writing. He said: "You are entitled to two and one-half per centum on the first $20,000, and one per centum on all over $20,000, save you must not exceed $1,000 in any one year, and this includes all funds coming into your hands, except what was turned over to you by your predecessor, who, it is presumed, took his commissions before turning the money over. This is the way I have always construed the law, and is the way all treasurers have paid themselves.

Why should not the revenue agent be contented with his own construction? Why should money retained by the county treasurers by and with his advice and consent be now subject to his demand through the instrumentality of the courts of law and equity? Why should it be presumed that the legislature,

in expressing its will in the form of permanent law, should have used language so mysterious that it had one meaning, universally acted upon throughout the state by the authorized representatives of the state, for many years, and said meaning accepted by every state officer whose duty it was to interpret it, and, suddenly, in the closing year of the century, that officer, in the light of some fancied new revelation, is to be permitted to indulge in a philological somersault, and, by his own peculiar translation of the statute, impose liability upon innocent widows and their dependent ones, and unoffending sureties acting officially upon the generally accepted construction of the law by those upon whom rested the duty of its enforcement?

To the laity or unlearned mind there does not seem to be any ambiguity in the terms employed by the lawmaker, and we respectfully submit that ninety-nine men out of one hundred, on reading the provisions of the law concerning the payment of the county treasurers, would immediately say what the revenue agent deliberately said in his letter to Mr. Buie, that the county treasurer was entitled to a commission upon the school fund. The language of § 2016, code of 1892, taken alone, does not seem to be reasonably susceptible of any other interpretation.

It clearly appears that the treasurer is entitled to a commission on all money received by him for county purposes with but one exception, and that is that he cannot claim compensation upon funds received from his predecessor in office. What valid reason can be advanced for eliminating from "county purposes" the education of its inhabitants? If it be a "county purpose" to provide for the administration of justice by the erection of courthouses, establishment of jails and the maintenance of an expensive system of judicial administration; if it be a "county purpose" to provide for the indigent and ailing of a county by the erection of poorhouses; if it be a "county purpose" to preserve the health of the people by prescribing quarantine lines and feeing health officers; if it be a "county

purpose '' to promote the convenience of the public by main-
taining roads, ferries and bridges, clearly it ought to be a
'' county purpose '' to secure for the children of its people the
privileges and advantages of education. All measures for the
legitimate advancement, protection and aid of the best interests
of the residents of a county should be embraced in the term
'' county purposes.'' It requires a resort to hair-splitting con-
struction to so emasculate the term '' county purposes '' as to
preclude from its beneficent operation the intellectual develop-
ment of the educable children of its inhabitants.

The treasurer is charged with a responsibility for the man-
agement of the school fund in his hands and is required to
make semi-annual reports of all moneys accruing to the com-
mon school fund from polls; to keep separate and distinct ac-
counts of the moneys arising from poll taxes, from taxes levied
by the boards of supervisors for the maintenance of public
schools, from the distributive share of the common school fund,
from Chickasaw school fund, from interests derived from the
sixteenth section fund and funds arising from leases of those
sections and funds from any other source; to receive and re-
ceipt for all moneys on account of school funds of the county,''
etc.

It is admitted that no county treasurer in the state ever re-
ceived $1,000 compensation, the maximum limit prescribed by
the statute, if the commissions or fees on the school fund is ex-
cluded from the computation of receipts, and it is not to be
presumed that the legislature would incorporate such a useless
limitation in the statute if it were not understood that in some
cases the compensation exceeded $1,000 when the commissions
on the school funds were included.

The words '' county purposes '' are not technical, and must
be used in their common and ordinary acceptation and meaning,
and having been universally construed for many years to em-
brace school funds, the contention of the revenue agent, so
utterly opposed to his former opinion, should not be permitted

to prevail.    Hutch. code, p. 463, art. 2; *Id.*, p. 230, art. 37; code of 1857, art. 166, p. 369; act of April 6, 1874; code of 1880, § 460.

Even if the meaning of the statute were doubtful, the construction placed on it by the public officers of the state, and which is in favor of the county treasurers, should be decisive of the question at bar.

Sutherland on Statutory Construction, sec. 309, says: "The practical construction given to a doubtful statute by the public officers of the state, and acted upon by the people thereof, is to be considered; it is perhaps decisive in case of doubt."

Again: "Contemporary construction and official usage for a long period, by the persons charged with the administration of the law, are among the legitimate aids in the interpretation of statutes."    Sedg. on Stat. and Consti. Law, pp. 212, 213; 23 Am. & Eng. Enc. L., p. 339; *Packard* v. *Richardson,* 17 Mass., 122; *Bank of Utica* v. *Mercereau,* 3 Barber's Chy., pp. 530, 557; *Cohens* v. *Virginia,* 6 Wheat. (U. S.), 418; *United States* v. *Gilmore,* 6 Wall., 330; *Plummer* v. *Plummer,* 37 Miss., 185; *Venable* v. *Wabash Railroad Co.,* 112 Mo., 125 (20 S. W. Rep., 493).

*Phil. A. Rush,* on same side.

The expression, "all money received by him for county purposes," in § 2016 of the code, defines the rights of a county treasurer, as to the amount of commissions he shall receive. His commissions are taken from all money received for county purposes, and not from money received for purposes other than these.    This money would be not alone the common county funds, nor the Chickasaw school fund, nor the institute fund, nor the schoolhouse fund, nor the poll tax fund, nor the jail or courthouse funds, but all these and more.    But it would not include any fund not received for some general, public purpose in the county.    It does not include the confederate pension fund.    Ch. 35, p. 54, Laws of Miss., 1898.    I believe it would

not include the fund collected for the purpose of maintaining a fence around a stock-law district.    Laws 1878.

The adjective "county" is used (1) as "a division of a state, made for judicial, political and administrative purposes;" (2) as "the people of a county." These are the prominent definitions. It is evident that the law we have here refers to the "people of the county"—that collective noun called "the public," and, reading the law as thus understood, we have it "all money received by him for the purposes of, or for the benefit of, the people or inhabitants of the county. All doubts are then cleared away, and we know the treasurer is entitled to commissions on every fund which serves a purpose public in its nature—any purpose which the people have in view, or which the law has marked out for them.

The contention of opposing counsel, that the purposes for which a school fund is received is not a county purpose, but the purpose marked out by the constitution, is a novel proposition. As if it mattered what fund the money might be before received, or from what sources they might be derived, or where originating, whether in the organic law, or under the statutes of the state! The question is, what are the purposes for which the trust is created? For the county treasurer is a trustee. Some of the funds may be gifts, some may be a local tax, some may be a general tax, some may come from legacies of individuals. If they are received for certain purposes by the trustees, that settles the contention.

Let us not put cause for effect; the cart before the horse. If we are looking for results, benefits, practical advantages (some of the definitions of "purpose"), let us acknowledge them wherever found, not disputing about causes. We are not looking for remote purpose, which is nothing more than object, but for nearby purpose. When object becomes active and approaches accomplishment, it then becomes purpose, and it is synonymous with benefit. The object of the constitutional con-

vention is one thing, the purposes of the people of a particular county or school is another thing. No matter what may be the object or the remote purpose of the people of the state as a whole in raising the common school fund, the particular part of the fund which is distributed to a particular county is received for the purposes of that county, and for no other purposes.

Again, " first cause " is not synonymous with" purpose; " final cause is. If we should undertake to refer all purpose back to first cause, all purpose would be the creator's, and man would be eliminated. When we speak of receiving anything for a certain purpose, we have in mind the thing to be accomplished, and refer to the person, thing, community, etc., to be benefited. If we go back behind the final cause and final beneficiaries, we lose ourselves in a mist of doubt as to whose purpose is being worked out. Suppose the state should uncover a mine on her public domain, whose riches should give us money for all purposes, would the money appropriated to a county be received for county purposes? I am of the opinion that it would, notwithstanding the fact that it had become the policy and purpose of the state to pay all our expenses, general, county and school; and, without any change in present law, the county treasurer would be entitled to commissions on the funds so re-received.

Vanderbilt had a purpose in giving money to establish the great school bearing his name, but his purposes are now lost in the purposes of the school, as worked out by the board of visitors. So, whatever general purpose the state, as a whole, or the representatives of the sovereignty of the state in constitutional convention assembled, had in providing the scheme of our free school system, this purpose is now lost in the practical purposes of the people of the county, as worked out by their servants, the county superintendent, the board of supervisors, the county school board, the trustees and the teachers, with the help of the county treasurer, who plays an important part in the work.

Counsel for appellant contends that a law giving commissions on the school fund would be unconstitutional. This is not maintainable. Every person who assists in the school work, from tax assessor to teacher, is given a compensation. No system of government, and no branch of the system, could get along without paying the agents of the system. The constitution says nothing about paying any one for helping in the work of establishing and maintaining the system of free public schools, which is required by it to be done. It does not descend into particulars; these things are left to the legislature.

Again, the constitution recognizes the schools of a county as a county matter. The county superintendent is a county officer, and the property of the schools is county property, and the administration of the system belongs to the county. By section 205 of the constitution the obligation to maintain the schools a certain four months is on the county, and a penalty is prescribed for a failure to do so.

There are many expressions in our laws to designate the common county fund, but nowhere do we find this fund referred to as embracing "all money received for county purposes." Nowhere, in all the law, do we find the expression we are discussing used in the sense in which opposing counsel wish the court to now take it. "Common county fund" is the expression used everywhere in the law to designate the funds other than school funds, and it is presumed not only that the same words mean the same thing in different places in the same code of laws, but it is also presumed that the use of different well-chosen words carries with such use a difference in meaning. The expression under consideration clearly means the school funds of the county, as well as the common county and other funds of a like public nature.

The recognized policy of our state is to pay all officers for all the services performed, and if there is a doubt about the meaning of this law the construction of the same should be in favor of this recognized policy of the state. *Shelton* v.

*Baldwin,* 26 Miss., 439. And if there is a doubt, it would seem that the uniform official construction in our favor would make the doubt for us, not against us.

I do not see how counsel for appellant finds any consolation in the fact that these two sets of funds, common county and county school, are not managed throughout by the same officers. The county auditor does audit accounts with both funds, but the county superintendent comes in and takes the place of the board of supervisors, and for the very good reason that the average supervisor is not equal to the task or work given the superintendent.

In several cases this court decided that the general bond of the county treasurer, given under § 403 of the code of 1880, § 3055 of the code of 1892, did not cover the school funds, for the reason that there was another bond required for the school fund. There was never any question of the language of those sections being broad enough to cover every duty of the treasurer had it been possible to construe them alone. So, in our case here, if there were another section giving commissions on the school funds, the existence of such a law would preclude the idea that commissions should be taken in two places. But there is no reason why this statute should be given a meaning other than that which flows naturally and ordinarily from the words and sentences used. This is the rule of construction. See § 1522 of the code of 1892. Who will say that the common and ordinary acceptation and meaning of this § 2016 is otherwise than as we would now have it? Has it not been thus understood for twenty-five years?

Again, who would say that the use of the common county fund to build and maintain a county bridge would serve a better county purpose than the use of county school funds to build a county schoolhouse and maintain a school therein? The one gives a merely physical advantage, the other a moral, mental and (shall I say?) spiritual advantage.

*Mc Willie & Thompson*, on same side.

All the averments of the answer being admitted by the complainant, the question for decision is one of law, to be determined by the construction of the statute (§ 2016, code 1892), or, to narrow the inquiry, the interpretation of the words "county purposes" as including or not including the county school fund as a part of the amount on which county treasurers are entitled to commissions.

It is not readily seen why funds by law devoted to a work of public utility exclusively within a particular county and for the benefit of its people are not employed for county purposes. In the case in hand the fund was one for the support of the schools of Warren county, were appropriable to that purpose in that county and were held for county purposes, unless education be a thing in which a county and its people can have no interest.

Neither of the two words "county purposes" is a technical word, and they must be taken to have been used in the ordinary and popular signification. *Peeler* v. *Peeler*, 68 Miss., 141; *Green* v. *Weller*, 32 Miss., 650; *Forniquet* v. *R. R. Co.*, 6 How. (Miss.), 116; *Brien* v. *Williamson*, 7 How. (Miss.), 14; *Smith* v. *Halfacre*, 6 How. (Miss.), 582.

It is provided by § 1522, code of 1892, as follows: "All words and phrases contained in the statutes are used according to their common and ordinary acceptation and meaning, but technical words and phrases according to their technical meaning."

While this statute may be only declaratory of the rule of the common law, it undoubtedly gives emphasis to that rule in the construction of all parts of the revision in which it occurs; and the primary inquiry in determining the intent of the legislature involves the ascertainment of the common and ordinary acceptation and meaning of the words. What this was in the case before us can hardly remain a matter of doubt when we ascertain that all the people of the state, or at least all of them

who ever had occasion to consider the subject, have for a great number of years taken the words "county purposes" to have been used in the statute in the sense of all public funds received by county treasurers for the exclusive use of their respective counties and the inhabitants thereof. This would seem conclusive as to the common and ordinary acceptation and meaning of the words.

·There is no reason discernible why commissions should not be allowed on the school fund as well as any other money in the hands of a county treasurer for the use of his county, and we are unable to admit that the words "county purposes" as used in the statute are of such doubtful import as to justify any resort to the rules of construction. But applying the cardinal principle of statutory interpretation that the intent of the legislature, rather than the abstract force of some of the words used, is to govern, we find that the question is freed from all uncertainty. We must look to the design and scope of the statute and give it such a construction as will carry out its object even should the result be contrary to the ordinary meaning of some of its words. *Board of Education* v. *R. R. Co.*, 72 Miss., 236; *Eskridge* v. *McGruder*, 45 Miss., 294; *Bonds* v. *Greer*, 56 Miss., 710; *Leachman* v. *Musgrove*, 45 Miss., 511; *Learned* v. *Corley*, 43 Miss., 687; *R. R. Co.* v. *Hemphill*, 35 Miss., 17; *Love* v. *Taylor*, 26 Miss., 567; *Pointer* v. *Trotter*, 10 Smed. & M., 537; *Dixon* v. *Doe*, 1 Smed. & M., 70; Black on interpretation of Laws, 49–56.

The statute provides that in no case shall a county treasurer receive more than $1,000 for his compensation, and the answer avers that in not a county of the state have the commissions allowed by the statute ever exceeded that sum exclusive of commissions on the school fund. This averment is admitted, and the legislature must have recognized the existing state of affairs and had in view the case of those counties in which, including commissions on the school fund, the compensation of the treasurers would exceed one thousand dollars. Looking to

the fact that the legislature must have taken note of the condition of affairs in some of the counties of the state where the treasurer's commissions, including those on the school fund, would exceed $1,000, it is seen that the scope and design of the act clearly contemplated an allowance of commissions on that fund. It cannot be presumed that the legislature acted in ignorance of existing conditions both in 1880 and 1892 when the codes of those years were adopted.

But the pleadings admit the further averment that without commissions on the county school fund the compensation provided by the statute in question for county treasurers would be unjust, inadequate and disproportionate to the responsibility imposed upon them and against the public policy of the state. Certainly a construction contrary to public policy will not be given to the statute should its meaning be regarded as doubtful. The courts will prefer a just and equitable construction that is consistent with the public policy of the state to one which is contrary to that policy and would work unjustly and inequitably. *Shelton* v. *Baldwin*, 26 Miss., 439; Black on Interpretation of Laws, 42, 56, 100, 102, 107. When the policy of the legislature is manifest it will be followed even in opposition to the strict letter of the statute. *Ingraham* v. *Speed*, 30 Miss., 410; *Read* v. *Manning*, 30 Miss., 308; *Olive* v. *Walton*, 33 Miss., 103.

It is a part of the public policy of Mississippi to give adequate compensation for all public service; not merely to pay, but to adequately pay for the work done and responsibility incurred, thus securing the services of competent and reliable men. This is shown by the legislation of many years on the subject of fees and salaries, and in no instance is it better illustrated than in the commissions allowed to the able and active officer who brought this suit.

The answer shows that during the whole time the statute has been in force it has been understood to authorize an allowance of commissions on the county school fund by all the various

state and county officers whose duties involved an ascertainment of its meaning, as well as the general public, and that, until about the time of instituting this proceeding, the complainant himself labored under what he now claims was a universal misapprehension of the legislative intent.    The allowance of these commissions by the boards of supervisors throughout the state involved the exercise of judicial power, and these judgments are not relied upon to estop the present inquiry, but as constituting the contemporaneous construction of a judicial body to be considered along with the similar adjudication of other inferior courts mentioned in the answer, thus bringing the case within the rule announced in *Plummer* v. *Plummer*, 37 Miss., 185. The rule that courts should consider the contemporaneous practical construction placed on a statute by the public, and those whose official duty involves its interpretation, is too well recognized to require any extended reference to authority.    Sutherland on Stat. Con., sec. 307, 309; *Ib.*, sec. 256; Black on Interpretation of Laws, sec. 215-220; *Ib.*, sec. 70, p. 161; *Chrisman* v. *Brookhaven*, 70 Miss., 478.

The argument, that in order to give any effect to the word "county," as qualifying the word "purposes," in the statute, the school fund must be distinguished from the other funds in the hands of the treasurers, begs the whole question, for the fund applied to purposes of education in the county is as much one received for county purposes as any of the others.   But, if mistaken in this, and it be true, as matter of fact, that the school money is the only fund from which other funds held for county purposes can be distinguished, it does not follow that complainant's construction of the statute should be adopted.   The rule that effect must be given to every word or phrase of a statute, if possible, must be taken as modified by the other equally important canon of construction, that such word or phrase must be rejected as unmeaning and surplusage if it be repugnant to the rest of the act and tend to nullify its object.    As this court has well said, the rule will not be suffered to absorb the statute or over-

turn the legislative will. *Fitzgerald* v. *Rees*, 67 Miss., 473; *Earhart* v. *State*, 67 Miss., 325; *Lemonious* v. *Mayer*, 71 Miss., 514; *Board of Education* v. *Railroad Co.*, 72 Miss., 236; *Logan* v. *State*, 53 Miss., 431; *Mitchell* v. *Wood*, 47 Miss., 231; *Witherspoon* v. *Blewett*, 47 Miss., 570.

A serious difficulty in the way of giving to the word " county " the effect claimed for it by opposing counsel is that to do so would render nugatory a clear and definite portion of the statute. We refer to that part of the statute in connection with which is noted the fact that never in any county of the state have the commissions received exceeded one thousand dollars exclusive of those allowed on the school money. In re-enacting the statute in the code of 1892 the legislature was aware of the condition of things then existing and that had existed for twelve years under the code of 1880, containing the same provision, and must be taken to have contemplated the retention of commissions out of the school fund.

But there is no foundation for the application of the rule, it being a wholly erroneous idea that there are no funds in the hands of the county treasurers that are not held for county purposes. The net proceeds arising from the ranger's sales of estrays are paid over to the county treasurer, but they do not become a part of the county funds until after the expiration of three years, and not then unless the owner has failed to assert his right and take the same. Code of 1892, §§ 1726, 1729; code of 1880, §§ 906, 910. So also where there is a stock law district of one or more townships constituting a part of a county the tax collected to build or repair fences which goes into the hands of the county treasurer is not a fund for the use of the county at large, nor held for county purposes. Under the code of 1880, which contained exactly the same provision for the compensation of county treasurers as that under consideration, the excess bid at a tax sale of land was paid over to the county treasurer and held by him, not for county purposes,

but for the use of the owner.   Of course the present statute has the same meaning its prototype of the code of 1880 had. While not a matter of statutory regulation, as the state's pension law is administered, the county treasurers distribute, without deduction, direct to the pensioners the money received from the auditor of public accounts as pension commissioner. Code of 1892, § 3225, 3228.

We respectfully submit that there has been no universal error as to the intent of the statute under discussion, and that technical reasoning, however acute and learned, will not be accepted as showing that to the understandings of men their mother tongue has lost its meaning.   It was to obviate the harmful effect of such reasoning that our code (§ 1522) provides that the words used therein shall be taken "according to their common and ordinary acceptation and meaning."   This declaratory statute was intended as a barrier against the subtlety that would refine away expressions of the public will; but it is no better than an open gate, if unavailing to protect the appellees in this controversy.

TERRAL, J., delivered the opinion of the court.

Section 2016, annotated code, provides that "The county treasurer shall be allowed two and one-half per centum on all money received by him for county purposes," and the question is made whether the school funds received by the county treasurer are subject to such commission.   We see no reason for supposing that the legislature did not intend the county treasurer to have a commission on the school money received by him for disbursement within the county.   We think the money received by the county treasurer, and disbursed in the county in payment of expenses incurred for governmental purposes, is money received for county purposes.

It is true that education, within some definitions of that term, is not a county purpose; certainly it is not a county purpose in the sense of being a system established by the county for the

public good, for, in such sense, the county has not purposed and established any system of government, in any respect, for the people of the county.   In such sense the administration of justice is not a county purpose, and, yet, next to the school fund, the money coming into the hands of the treasurer, for the payment of jurors, witnesses and officers and other expenses of the several courts constituted by the fundamental law or by legislative act, afford the next largest commission to the county treasurer, and, if the treasurer is to be denied commissions on the school fund, a like reason would deny him a commission on funds collected for the expenses incidental to the administration of justice.   And so of the funds received for building a courthouse, jail, poorhouse and bridges, all of which are designed and purposed by constitutional authority, and not by the county.   In fact, none of the operations of government, for whose support taxes are paid, and for the administration of which money is received by the county treasurer, are matters of county purpose in the sense that the machinery for the conduct of such operations is established for ends proposed by the county.   The constitution and laws require the counties to build courthouses, jails and bridges, and to execute other governmental agencies, but there is no agency of any sort inherent in the county, or which a county has proposed to itself for accomplishment, requiring the collection and disbursement of money. A county has no power to institute any scheme, design or purpose requiring the citizen to pay taxes to support such scheme, design or purpose; it is the agent of the state only in some respects to execute constitutional or legislative purposes.   We therefore construe the phrase, "money received for county purposes," to include school money, and all money not excepted from a commission.

*Affirmed.*